Matthew L. Lalli (6105)
Jeremy J. Stewart (12247)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
mlalli@swlaw.com
jjstewart@swlaw.com

*Attorneys for Plaintiff Lynn Wardley*

---

## UNITED STATED DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| LYNN WARDLEY, | **COMPLAINT** |
| Plaintiff, | |
| v. | Case No. 2:21-cv-00128 |
| SCOTT McLACHLAN and GARY KEARL, | Judge Ceilia M. Romero |
| Defendants. | **Jury Demanded** |

Plaintiff Lynn Wardley ("Wardley"), by and through the undersigned counsel, hereby complains against Defendants Scott McLachlan ("McLachlan") and Gary Kearl ("Kearl," and collectively with McLachlan, "Defendants") and for causes of action alleges as follows:

## PARTIES

1.      Wardley is an individual residing in Clark County, Nevada, and at all times relevant to this case was a resident of the state of Nevada.

2.      McLachlan is an individual residing in Utah County, Utah, and at all times relevant to this case was a resident of the state of Utah.

3.      Kearl is an individual residing in Utah County, Utah, and at all times relevant to this case was a resident of the state of Utah.

## JURISDITION AND VENUE

4.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as this is a civil action between citizens of different states in which the amount-in-controversy exceeds the sum of $75,000, exclusive of interests and costs.

5.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b), as all Defendants reside in the District of Utah and a substantial part of the events or omissions giving rise to Wardley's claims in the Complaint occurred in the District of Utah.

## GENERAL ALLEGATIONS

### Wardley and McLachlan Were Real Estate Development Partners.

6.      Wardley and McLachlan were business partners for many years, beginning in the mid-1990s.

7.      Wardley and McLachlan's business dealings together involved the purchase, improvement, and sometimes eventual sale of real estate and related assets, such as wells and water systems, in and around Saratoga Springs, Utah.

8.      Sometimes Wardley and McLachlan personally owned assets in their individual capacities as joint, equal owners.

9.      Other times, Wardley and McLachlan conducted their business affairs through, or through the use of, one or more legal entities.

10.     Lake Mountain Mutual Water Company ("LMM") is one corporation that was utilized by Wardley and McLachlan to conduct some of their joint business.

11.     At all times relevant to this Complaint, McLachlan has been a 50% owner, one of two directors, and the sole president of LMM.

12.     At all times relevant to this Complaint, Wardley has been the other 50% owner, the other director, and the other officer of LMM.

13.     Another entity used by Wardley and McLachlan, or through which Wardley and McLachlan conducted some of their joint business, was Saratoga Springs Development, LLC ("SSD").  SSD is a Utah limited liability company in which Wardley/McLachlan Development, LLC ("WMD") is the sole member and manager.  WMD is itself a Utah limited liability company in which Wardley and McLachlan are the equal owners and members.

**The Water Agreement**

14.     In the 1990s and early 2000s, and frequently without observing legal and corporate formalities about which individuals or entities either (i) owned what assets or (ii) were taking which actions, Wardley, McLachlan, LMM, and SSD (collectively referred to as the "JV Parties") engaged in efforts to develop a municipal water system for the residents of Saratoga Springs City (the "City").  This culinary system included, for example, water wells, water storage facilities, and water pipelines.

15.     As the City began to grow and take on more of its own efforts regarding a municipal culinary system, disputes arose between the City, the JV Parties, and others regarding such things as who would pay for and profit from that system.

16.     For example, in 2003, the JV Parties sued the City in Utah's Fourth Judicial District Court, Case Number 030404621, seeking to resolve such disputes with the City regarding the municipal water system, to which the City asserted counterclaims of its own (hereinafter, the "City Lawsuit").

17.     The disputes with the City, and in particular the City Lawsuit, were resolved via a "Settlement and Culinary Water Asset Purchase and Sale Agreement" dated February 2, 2005 by and between the City and the JV Parties (the "Water Agreement").

18.     In the Water Agreement, to the extent of their interest therein, the JV Parties sold to the City, and the City bought from such JV Parties the vast majority of their water-related assets.

19.     Because of the somewhat informal way in which the JV Parties had operated—and the resulting lack of clear ownership or title to specific water assets—the Water Agreement provides that each of the JV Parties transferred to the City whatever rights, title and interest each such party had in the water assets, and appointed LMM as their agent to convey all of their rights, title and interest in the water assets to the City.

20.     Wardley and McLachlan did not give up all water assets in the Water Agreement. The Water Agreement reserved to Wardley and McLachlan a total of 300 acre-feet in water credits that Wardley and McLachlan could redeem from the City in the future for Wardley and McLachlan's own future development projects (the "Water Credits").  Wardley and McLachlan initially remitted and sold 59.20 acre feet of the Water Credits, leaving 240.80 acre feet in water credits.  Wardley and McLachlan have agreed that they are each entitled to half of the remaining Water Credits, or 120.40 acre feet each.

21.     The purchase price the City agreed to pay for the water assets acquired by the City was $21 million.  The City agreed to pay that $21 million through monthly payments over a 20-year period, with the amount due each month determined by the number of culinary water system connections sold by the City that month.  If those monthly payments do not result in full payment of the $21 million purchase price by February 2, 2025, the Water Agreement requires the City to pay the remaining unpaid portion on that date.

22.     So that the City need send only one check each month, the Water Agreement did not require the City to send a separate check with proportional payments to the JV Parties.  As between and among the JV Parties, there was little desire to make administrative matters

confusing or difficult for the City in making payments pursuant to the Water Agreement; and, at that time, it was sufficient for the JV Parties, among themselves, to know that (i) the City would be making payments pursuant to the Water Agreement, and (ii) Wardley and McLachlan each were entitled to 50% of those payments – regardless of whether those payments were received by each of them directly or through one of the JV Parties.  Therefore, for administrative ease, the Water Agreement instructed the City to make the monthly payment via a single monthly check to LMM.

23.     Moreover, Wardley and McLachlan owed a relatively small amount of their payments from the Water Agreement to a former co-developer named Paul Johnson.  In addition, after Mr. Johnson was paid, Wardley and McLachlan owed 3% of the remaining Water Agreement funds to Peter Staks, who performed certain services for the JV Parties. Wardley and McLachlan were obligated to make those two payments from the Water Agreement funds before splitting the remaining Water Agreement funds 50/50.

24.     Starting in March 2005 and continuing to the present, the City has made required payments under the Water Agreement by sending checks to LMM, in its capacity as agent for Wardley and McLachlan, who actually sold assets pursuant to the Water Agreement.

25.     On a nearly monthly basis over that year, an accountant hired by McLachlan (i) received the City's check, (ii) deposited the funds into a bank account, (iii) wrote four new checks from that account, i.e., a small check to Johnson, then 48.5% to Wardley, 48.5% to McLachlan, and 3% to Staks, (iv) sent all four checks to Wardley to endorse, and then (v) sent all three checks to McLachlan to endorse.  This process allowing Wardley, McLachlan, Staks, and Johnson to do as they pleased with the funds they received from their fully endorsed checks.

**Wardley and McLachlan Begin Separating Their Affairs, Including with New Agreements.**

26.    Around the time of the Water Agreement, Wardley and McLachlan started winding up their joint business affairs and stopped doing business together.

27.    For example, after the Water Agreement, LMM had no anticipated activities, its purpose had been fulfilled, and it ceased conducting any new business.

28.    In fact, notwithstanding that the City continued writing a single check to LMM pursuant to the Water Agreement, in 2008, McLachlan, LMM's president, let LMM's corporate registration lapse by failing to file a corporate renewal with the appropriate governmental agency, and, as a result, LMM has since been an expired entity.

29.    And, while SSD has had some minor operations since the Water Agreement, such as interacting with the City and finishing outstanding development obligations, it has not engaged in any new development or new business ventures.

30.    Then, in a February 2006 Restructuring and Distribution Agreement, Wardley and McLachlan divided up the vast majority of their jointly held assets and, for the most part, parted ways.

31.    Wardley and McLachlan have not engaged together in any new development or new business ventures since the 2006 Restructuring and Distribution Agreement. Their interactions since the 2006 Restructuring and Distribution Agreement largely have been limited to tying up loose ends and litigating remaining disputes.

32.    In connection with the 2006 Restructuring and Distribution Agreement, Wardley and McLachlan also entered into a 2006 "Revised Agreement for Share in Profits" with Staks (the "Staks Agreement"). The Staks Agreement again "entitled [Staks] to receive 3% of the income distributed to McLachlan and Wardley under" the Water Agreement. Regarding the payment of that 3% to Staks, the Staks Agreement required Wardley and McLachlan each to pay

Staks 1.5% of the income they received from the Water Agreement within ten days after McLachlan and Wardley received their funds under the Water Agreement, with any late payments incurring interest at a rate of 18% per annum until paid in full.

33.     Therefore, starting with the Staks Agreement and continuing on a nearly monthly basis until March 2018, the Water Agreement payments were issued to Wardley, McLachlan, Staks, and Johnson through four checks for their respective shares according to the procedure previously outlined in paragraph 25.

34.     That arrangement for handling the Water Agreement checks worked like clockwork for over a dozen years until, in March 2018, McLachlan began refusing to endorse the Water Agreement checks and therefore began withholding the funds from Wardley and, eventually, Staks (though not Johnson) in order to gain leverage over Wardley in an unrelated lawsuit between Wardley and McLachlan.

**Wardley and McLachlan Litigate for Years in the Ongoing Wells Case.**

35.     Between 2008 and 2012, Wardley repeatedly asked McLachlan to cooperate to dispose of some assets jointly held by Wardley and McLachlan, including two real property lots and two wells.  McLachlan did not respond.

36.     In 2012, after years of getting no response from McLachlan, Wardley filed a lawsuit in Utah district court in which Wardley sought declaratory judgment or partition such that the lots and wells would be sold and the proceeds split 50/50.  That case was styled *Wardley v. McLachlan et al.*, case number 120400700 (the "Wells Case").

37.     Throughout the Wells Case, McLachlan did not raise any substantive defenses to the subject of Wardley's claims—splitting the proceeds of the two wells and two lots. Nevertheless, McLachlan responded to Wardley's claims in the Wells Case with a barrage of counterclaims concerning other issues.  By way of explanation, McLachlan told his business

manager, Dan Cary, that McLachlan's strategy in the Wells Case was that McLachlan "had deep pockets and he's going to win regardless . . . . [McLachlan] said he didn't care if it cost him $1 million." True to that plan, McLachlan continues to engage Wardley in litigation in the Wells Case to this day.

38.     McLachlan was and is assisted throughout the Wells Case by his business manager, Kearl. Indeed, Kearl has taken a more active role in the Wells Case in developing strategy and coordinating with McLachlan's counsel. McLachlan has taken a more passive role in the Wells Case, even though he is a named defendant.

39.     In 2015, Wardley defeated the vast majority of McLachlan's counterclaims on summary judgment.

40.     Also in 2015, Wardley prevailed on his motion for partial summary judgment that asked the court to order that the two lots be appraised and sold, and that the proceeds be split 50/50 between Wardley and McLachlan.

41.     In 2016, having obtained the relief he sought regarding the lots, Wardley filed another motion for partial summary judgment seeking the same relief regarding the two wells: that the court order the two wells appraised and sold, and the proceeds split 50/50.

42.     McLachlan opposed that motion by filing an opposition brief supported by a sworn declaration in which McLachlan testified and revealed—for the first time—that McLachlan did not own the property on which one of the wells was located because that property was owned by his parents in the early 2000s (when the well was drilled and at the time McLachlan purportedly granted the easement) and still was owned by McLachlan's parents' estate in 2016. Therefore, McLachlan argued that the court could not grant the relief Wardley sought because the well was on someone else's property and the easement McLachlan had contractually agreed to give to that well—in the 2006 Restructuring and Distribution

Agreement—was void ab initio because he could not grant an easement across someone else's property.

43.    The court agreed that McLachlan's sworn testimony—that McLachlan did not own the property—precluded the court from granting Wardley's requested relief.  But the court also found that this new admission justified Wardley amending his complaint in the Wells Case to add claims for fraud, negligent misrepresentation, breaches of fiduciary duties to Wardley, and a breach of the 2006 Restructuring and Distribution Agreement.

44.    Wardley amended his complaint to add those claims in early 2017 (the "amended complaint").

45.    At this point, particularly with the filing of his 2016 declaration, McLachlan had made things even worse for himself in the Wells Case.

46.    To resolve another dispute McLachlan had raised in opposing summary judgment regarding whether the wells were owned by Wardley and McLachlan individually or through LMM, Wardley also added LMM as a defendant in the amended complaint.

47.    In April 2017, McLachlan and Wardley, through their litigation counsel, filed with the court a "Stipulation Regarding Representation of Entities" in which the parties "stipulate[d] and agree[d]" that LMM is "a dissolved Utah non-profit corporation" and, to "avoid possible conflicts of interest," LMM would not have separate counsel in the Wells Case but would be bound by the result of the Wells Case.

### McLachlan's Legal Troubles Grow with Two New Lawsuits Against Him.

48.    McLachlan's legal troubles increased when two new quiet title lawsuits were filed against McLachlan and LMM—one by his parents' estate and one by the estate's buyer of the property, B&B—seeking to quiet title to the property based in part on McLachlan's 2016 sworn declaration in the Wells Case testifying under oath that the estate—and not McLachlan—owned

the property.  In those lawsuits, McLachlan argued—contrary to his 2016 affidavit in the Wells Case that he did not own the property—that he did own the property due to "equitable title" and that he always had owned that property.  Eventually, McLachlan bought out his siblings (the other beneficiaries under the estate) for at least $2 million to make that case go away.  Then, to dispose of the lingering B&B lawsuit, McLachlan gave up undisclosed consideration to B&B in a settlement agreement McLachlan refused to share with Wardley, even though Wardley was one of two officers, owners and directors of LMM, which was a defendant in those two suits.

49.     McLachlan was represented in both the estate lawsuit and the B&B lawsuit by the same legal counsel representing McLachlan against Wardley in the Wells Case.  Despite that, McLachlan hired that same legal counsel to represent LMM in both the estate lawsuit and the B&B lawsuit, over Wardley's objections and despite Wardley's multiple warnings that doing so created a conflict of interest.

50.     Even worse, throughout that conflicted representation of LMM, McLachlan and his counsel refused to communicate with Wardley, refused to discuss the cases or strategies with Wardley, refused to share information about the cases with Wardley, refused multiple written requests by Wardley for information and communications about the representation and cases, and refused to share—and actively concealed—litigation filings and documents from Wardley, even though Wardley is a 50% owner, one of two directors, and one of two officers of LMM, a defendant in the two cases.

### Defendants Conspired to Withhold Wardley's Water Agreement Funds to Gain Leverage Over Wardley in the Wells Case.

51.     Meanwhile, in the Wells Case, Defendants began conspiring to develop new arguments and strategies to defeat Wardley, to further McLachlan's goal to outspend and outlast Wardley in the Wells Case, and to force Wardley into an artificially lopsided and unfair settlement.

52.    One of Defendants' main strategies to accomplish those goals involved using the City's ongoing payments under the Water Agreement—which payments, at that point, were still being split routinely according to the arrangement and practice that McLachlan, Wardley, Staks, and Johnson had followed for over a decade—to create leverage over Wardley.

53.    Defendants first sprung this new strategy on Wardley during Wardley's second deposition in the Wells Case, which took place in January 2018 and which occurred due to the new discovery that was allowed on Wardley's new claims in his 2017 amended complaint.

54.    Instead of focusing on Wardley's new claims that justified that second deposition of Wardley, McLachlan asked Wardley a series of questions about whether Wardley had paid his individual income taxes on the portion of the Water Agreement funds that Wardley had received from the City.  Wardley had paid his taxes.  But, after much argument and briefing to the court, the court ruled that, even assuming Wardley did not pay taxes on his Water Agreement-related income, "that is an issue between Wardley and the IRS and has nothing to do with Wardley's new fraud claims."  Therefore, the court precluded McLachlan from such discovery and from trying to inject into the Wells Case irrelevant and baseless issues regarding Wardley's payment of taxes on his income under the Water Agreement.

55.    Undeterred, in March 2018, McLachlan for the first time refused and failed to endorse the two checks to himself and Wardley.

56.    Notably, McLachlan continued to endorse the checks to Johnson—with whom McLachlan was engaged in ongoing business—until Johnson was paid in full and Wardley and McLachlan had satisfied their payment obligations to Johnson.

57.    McLachlan also continued to endorse some checks to Staks, though McLachlan eventually stopped endorsing Staks' checks as well and Staks now has not been paid his portion of the Water Agreement funds for over a year.

58.     This unilateral action by McLachlan disrupted over a decade of smooth remittances of the Water Agreement payments and deprived Wardley and Staks of their portions of the funds to which they were, and are, entitled.

59.     From March 2018 to the present, McLachlan has continued every month to refuse to endorse the two checks to Wardley and McLachlan that would otherwise arise from the City's Water Agreement payment.  Therefore, as of the time of this Complaint, there is $5 million sitting in a bank account earning very little interest.  Of that amount, Wardley is entitled to roughly $2,400,000 and Staks is entitled to roughly $125,000.  Because McLachlan is holding this money hostage, Wardley and Staks have been and remain unable to use or invest that money.

60.     Moreover, McLachlan is exposing Wardley to significant interest owed to Staks and potential legal claims under the Staks Agreement.

61.     As of the time of this Complaint, the City still owes roughly $4 million in future payments under the Water Agreement, which must be paid at least by February 2, 2025.

62.     McLachlan refuses and fails to endorse the checks, and therefore is deliberately depriving Wardley and Staks of their Water Agreement payments, solely to advance McLachlan's goal of outlasting and outspending Wardley in the Wells Case and to gain leverage over Wardley to force Wardley into an artificially lopsided and unfair settlement of unrelated issues.  Any such forced settlement would be artificially lopsided and unfair because McLachlan is trying to create pretextual leverage (e.g., withholding Wardley's share of the Water Agreement payments) to force Wardley to forego significant consideration otherwise due or potentially due to him.

63.     McLachlan did and continues to do this at the advice and counsel of Kearl. Indeed, this scheme was devised by Kearl and continues to be perpetuated by Defendants acting in concert.

64.     To try to justify withholding the Water Agreement funds from Wardley and Staks, McLachlan abandoned his court-rejected argument that Wardley did not pay his personal income taxes on his share of such payments, and instead has started arguing that LMM owes taxes on all of the City's payments under the Water Agreement, including back taxes dating back to 2005, taxes on all amounts sitting in the bank, taxes on all future amounts paid by the City until the $21 million payment price is paid in full, and penalties for delay in paying those taxes.

65.     Even after the court rejected McLachlan's first attempt to inject such tax issues into the Wells Case via discovery, McLachlan again tried to inject this argument into the Wells Case via an expert disclosure, and McLachlan argued that he had to withhold the funds from Wardley and Staks to pay LMM's taxes and to offset any damages Wardley proved in the Wells Case.  The court rejected that argument and ruled that all tax issues were excluded from trial.

66.     A bench trial in the Wells Case resulted in a ruling and order from the court that McLachlan breached the 2006 Restructuring and Distribution Agreement, engaged in negligent misrepresentations, and breached his fiduciary duties to Wardley.  Wardley already has received a significant damages award from the court, although additional damages to Wardley totaling over $1 million are still to be decided in future post-judgment proceedings pending before the district court in the Wells Case.

67.     Nevertheless, McLachlan continues to withhold Wardley's and Staks' Water Agreement funds solely to continue exercising leverage over Wardley in the Wells Case and to try to force Wardley into an artificially lopsided and unfair settlement.

68.     McLachlan's tax argument is baseless and pretextual, and is carefully designed by Defendants in a manner that appears to prevent LMM from having to pay taxes on the Water Agreement funds but to give McLachlan a pretextual basis for withholding those funds from Wardley and Staks for as long as McLachlan wants, solely to gain leverage over Wardley.

69.    LMM does not have, and never has had, taxable income.

70.    LMM has never paid taxes or filed a tax return.

71.    LMM has never been audited or investigated by any tax authority, nor has LMM ever had its tax practices questioned by any tax authority.

72.    LMM's own tax accountant advised LMM, from 2005 through the present, that LMM owes no taxes.

73.    Over a period of more than 13 years, and having received annual statements sent by LMM's accountant to McLachlan's personal accountant each year, and despite more than 160 consecutive monthly payments having been made to McLachlan from the Water Agreement funds, McLachlan's own personal accountant never once questioned, inquired about, or complained about the practice or the manner in which the parties operated.

74.    LMM has never had a tax accountant or tax lawyer advise it that it owes taxes.

75.    McLachlan has refused Wardley's repeated requests to have LMM hire another tax accountant and/or tax lawyer to advise LMM regarding its purported tax liabilities.

76.    Wardley has always paid all of the income taxes he owes on his share of the funds paid to him under the Water Agreement.

77.    In fact, Wardley has paid all of the income taxes he owes on his share of the Water Agreement funds paid to him since March 2018 but withheld from him by McLachlan.

78.    McLachlan always has paid all of the income taxes he owes on his share of the funds paid to him under the Water Agreement.

79.    McLachlan does not believe LMM owes taxes.

80.    McLachlan does not think LMM owes taxes.

81.    McLachlan does not want LMM to pay taxes.

82.    McLachlan has no intention for LMM to pay taxes.

83.     McLachlan wants to avoid LMM having to pay taxes.

84.     McLachlan believes that LMM does not, and will not, owe any taxes.

85.     Defendants intentionally have tried to formulate and articulate their LMM tax arguments in a way that will allow LMM to never be required to pay taxes on past or future income once McLachlan uses those arguments as leverage against Wardley.

86.     Even though multiple years and multiple tax filing deadlines have passed since McLachlan started asserting that LMM owes taxes and penalties, McLachlan—LMM's President—has not taken any action to have LMM prepare or file a tax return or pay taxes.

87.     McLachlan has not hired any tax professional to prepare any tax return or tax filing for LMM.

88.     McLachlan has not prepared or filed any tax return or other tax documents for LMM.

89.     McLachlan has not contacted any tax authority regarding LMM.

90.     McLachlan has not paid any taxes on behalf of LMM or caused LMM to pay any taxes.

91.     Simply put, McLachlan has not taken any action that would or should be taken by a reasonable person who believes that the company for which he is the president owes taxes.

92.     McLachlan thinks and believes that he can make the LMM tax issue, which Defendants created, go away when that issue is no longer useful to McLachlan.

93.     McLachlan has refused multiple requests by Wardley and his agents to meet and to discuss McLachlan's tax argument in order to try to resolve this LMM tax issue.

94.     McLachlan does not want to resolve this LMM tax issue, which could be resolved easily, because he wants the LMM tax issue to remain unresolved only so that he can use it as leverage against Wardley.

95.     Even if a tax authority were to challenge LMM's past non-payment of taxes, and even if LMM were forced in the future to pay taxes and/or penalties, McLachlan still would not be justified in withholding all of Wardley's and Staks' Water Agreement funds, as McLachlan has done, but only that portion of the funds necessary to cover the tax liability.

96.     Defendants, conspiring together, created their LMM tax strategy and arguments solely to withhold funds from Wardley to gain leverage over Wardley in the Wells Case and to force Wardley into an artificially lopsided and unfair settlement.

97.     Kearl used his accounting education and background to develop the plan to fabricate tax arguments and withhold the Water Agreement payments as a means for McLachlan to try to gain leverage over Wardley, and to implement that plan.

98.     Kearl earned a Bachelor of Science degree in accounting from Brigham Young University in 1980.

99.     Kearl testified under oath during his September 2018 deposition in the Wells Case that he became a certified public accountant in 1982, that he held that certification consistently since 1982, and that he remained a certified public accountant at the time of his deposition.

100.    However, Kearl was not a certified public accountant at the time of his September 2018 deposition or at any time during which Kearl was advising McLachlan and LMM concerning LMM's purported tax obligations.  If Kearl ever was certified as a CPA, he had let that certification lapse before September 2018 and before advising McLachlan and LMM concerning LMM's purported tax obligations.

101.    On information and belief, Kearl never has been certified as a CPA in Utah.

102.    On information and belief, Kearl never has been certified as a CPA.

103.    The Utah Division of Occupational and Professional Licensing's online Licensee Lookup & Verification System contains no record of Kearl ever having been certified as a public

accountant in Utah.  Moreover, Kearl is not identified as ever having held a CPA certification in any state in the United States on cpaverify.org, a free and public CPA lookup tool populated by official state regulatory data sent from the 55 Boards of Accountancy to a central database.

104.    In any case, Kearl has no specialty or expertise in federal income tax accounting, non-profit corporate income tax accounting, or any income tax accounting specialty that would qualify him competently to advise LMM or its president, McLachlan, about LMM's tax positions.

105.    Indeed, Kearl does not even prepare McLachlan's personal or business tax returns.  McLachlan pays a different accountant to do that.

106.    And Kearl is not LMM's CPA and does not prepare LMM's accounting or tax documents.  LMM has its own CPA.

107.    Kearl was not involved in LMM when it was formed, when it was an active company, or for years after LMM's corporate status expired.

108.    Kearl was not involved at all in the negotiation or execution of the Water Agreement.

109.    From LMM's inception until Kearl started assisting McLachlan in the Wells Case, Kearl had no role in LMM or LMM's tax positions.

110.    From LMM's inception until Kearl started assisting McLachlan in the Wells Case, Kearl had no role in choosing, directing or advising if or how the Water Agreement funds were sent to Wardley, McLachlan, Staks, or Johnson.

111.    Kearl has never been authorized by Wardley, or LMM's board, to act or speak on behalf of LMM.

112.    Nevertheless, Kearl has extensive knowledge of, experience with, and involvement in McLachlan's business dealings and legal disputes, including the Wells Case.

113.    And Kearl has extensive knowledge of and experience with McLachlan's contracts, including the Water Agreement, the 2006 Restructuring and Distribution Agreement, and the Staks Agreement.

114.    And Kearl has extensive knowledge of and experience with McLachlan's fiduciary duties, including the fact that McLachlan owes fiduciary duties to LMM and Wardley, and that such fiduciary duties include the duties of loyalty, due care, not to engage in self-dealing, to act with the utmost good faith and in the best interests of LMM and Wardley, to be truthful with Wardley and LMM, and to fully disclose information to Wardley and LMM.

115.    And Kearl knew, understood, and testified under oath during his 2018 deposition in the Wells Case that when he advised McLachlan regarding LMM's tax positions, Kearl was advising LMM and McLachlan in McLachlan's role as president of LMM.

116.    Despite having no expertise or qualification to advise LMM or its president, McLachlan, about LMM's tax positions, and despite knowing of McLachlan's fiduciary duties to LMM and Wardley, Kearl plotted to concoct and advise LMM and its president, McLachlan, to adopt a tax position solely to try to benefit McLachlan and to harm Wardley, without regard to the consequences to LMM.

117.    More specifically, Defendants concocted a baseless tax argument and position for LMM to take, solely to justify McLachlan's self-serving actions to withhold funds owed to Wardley and Staks in order to give McLachlan leverage over Wardley in the Wells Case and to force Wardley into an artificially lopsided and unfair settlement.

118.    Kearl advised McLachlan to start and continue withholding from Wardley and Staks the money due to them under the Water Agreement and the Staks Agreement, respectively, solely to advance McLachlan's personal interest in gaining leverage over Wardley in the Wells Case and to force Wardley into an artificially lopsided and unfair settlement.

119.    Kearl advised McLachlan to advance baseless tax arguments that Defendants had no intention of following through on solely to justify McLachlan's withholding of those Water Agreement funds from Wardley and Staks.

120.    Kearl knew and advised McLachlan and LMM that LMM did not really have to pay the taxes Defendants were arguing to Wardley and others that LMM had to pay.  Yet Kearl advised McLachlan that he could and should take that baseless tax position and withhold the Water Agreement funds solely to gain leverage over Wardley in the Wells Case and to force Wardley into an artificially lopsided and unfair settlement.

121.    Defendants' scheme to argue publicly for LMM having tax liability just to benefit McLachlan and to hurt Wardley wrongly and needlessly increased the risk to LMM of being investigated by tax authorities and/or having to pay taxes that it otherwise should not and would not have been required to pay.  It was not and is not in LMM's interest for Defendants to take the actions they have publicly taken to advance baseless arguments that LMM should have to pay taxes solely in hopes of being able to use that argument as leverage against Wardley and then to abandon that argument and not take any action to have LMM pay such taxes.

### Defendants Schemed to Gain Leverage Over Wardley by Depriving Him of His Water Credits.

122.    In an attempt to gain even more leverage over Wardley and to force Wardley into an artificially lopsided and unfair settlement, Defendants also conspired to prevent Wardley from obtaining and/or using his portion of the Water Credits under the Water Agreement.

123.    Wardley and McLachlan have agreed that they are each entitled to half of the remaining Water Credits, or 120.40 acre feet each.

124.    On two separate occasions, Wardley successfully redeemed a portion of his 120.40 acre feet of the Water Credits from the City for use by Wardley in Wardley's development projects.  On both occasions, Wardley made a simple request to the City, the City

quickly complied and released the requested Water Credits, and Wardley easily redeemed—all combined—a total of 17.16 acre feet of Wardley's 120.40 acre feet of the Water Credits.

125.    Wardley remains entitled to 103.24 acre feet of the remaining Water Credits, and McLachlan remains entitled to 120.40 acre feet of the remaining Water Credits.

126.    However, during the course of the Wells Case, Defendants intentionally interfered in Wardley's efforts to use any more of his Water Credits, and intentionally took actions to deprive Wardley of his remaining 103.24 acre feet of the Water Credits, solely to gain and use leverage against Wardley in the Wells Case and to force Wardley into an artificially lopsided and unfair settlement.

127.    In the later years of the Wells Case, Defendants unilaterally contacted the City and, without informing Wardley, threatened the City with legal action if the City released any more of Wardley's Water Credits without McLachlan's express authorization.

128.    Defendants' threat to the City caused the City to fear legal action by McLachlan and to be unwilling to release any more of Wardley's Water Credits to Wardley without McLachlan's express authorization.

129.    Unaware of these communications between Defendants and the City, Wardley subsequently contacted the City to request that the City again release additional portions of Wardley's Water Credits for Wardley to use in his real estate developments in the area.

130.    This time, the City refused to release any more of Wardley's Water Credits due to Defendants' threats against the City.

131.    In early 2020, both Wardley and the City tried to get McLachlan to agree to the release of Wardley's remaining Water Credits for use by Wardley in one of Wardley's real estate developments.  The City expressed in writing that it wanted to give Wardley his remaining Water Credits and McLachlan his remaining Water Credits so that the City no longer would have any

obligation regarding the Water Credits, to avoid carrying costs to the City, and so that the City would not be caught between Wardley and McLachlan.  The City expressly stated that if the City could not release the Water Credits to Wardley and McLachlan soon, "the City will be forced to consider what carrying costs we will need to assess to Mr. McLachlan and Mr. Wardley as keeping these credits in our system comes at a cost to the City."

132.    Kearl advised McLachlan to withhold that consent and to maintain the threat against the City solely to benefit McLachlan by depriving Wardley of his share of the Water Credits, which Defendants hoped would give McLachlan more leverage over Wardley in the Wells Case and force Wardley into an artificially lopsided and unfair settlement.  That is, Defendants hoped that by depriving Wardley of the Water Credits that Wardley needed for his developments, it would create additional  pretextual leverage to force Wardley to forego significant consideration otherwise due or potentially due to him through the Wells Case or otherwise.

133.    McLachlan followed that advice and, in a written communication from his counsel to the City on behalf of McLachlan, again threatened the City with legal action should the City release any Water Credits to Wardley without McLachlan's written authorization.

134.    In that communication to the City, McLachlan admitted that Defendants' goal in holding Wardley's Water Credits hostage was to use the Water Credits as pretextual leverage over Wardley and to force Wardley into a global settlement with McLachlan:

> McLachlan and Wardley have several other jointly-owned assets and liabilities.  McLachlan understands that Wardley would like to separate the water rights at this time, but only because it will benefit him.  There is no benefit to McLachlan.  In fact, there is no reason why McLachlan would continue to agree to dissipate the jointly-owned assets while the joint liabilities remain outstanding. McLachlan believes a final, global, 50/50 resolution of all remaining assets and liabilities will be a fairly simple matter. McLachlan invites Wardley to return to our negotiations of a

global, 50/50 settlement, where we can resolve all remaining issues, including these water rights.

135.    Deprived of his existing Water Credits that McLachlan insisted on holding hostage for McLachlan's own self-dealing and self-interested purposes, Wardley was forced to expend his resources and cash to buy different water credits to use in his ongoing development projects, which unnecessarily deprived Wardley of those resources and cash and precluded Wardley from using those resources and cash for other investments, developments, and business ventures.

136.    To date, McLachlan continues to deprive Wardley of his 103.24 acre feet of the remaining Water Credits solely to try to benefit McLachlan by using the withheld Water Credits to obtain leverage over Wardley and to force Wardley into an artificially lopsided and unfair settlement.

### To the Extent Necessary, Wardley Can and Does Bring These Claims Directly Because LMM Is a Closely Held Corporation.

137.    LMM is a closely held company.

138.    LMM has only two equal shareholders:  Wardley and McLachlan.

139.    There is no ready market for LMM's stock.

140.    LMM's board is controlled by two equal directors:  Wardley and McLachlan.

141.    LMM lacks a board that is disinterested in that McLachlan is one of two directors on LMM's board and McLachlan has an interest in the decisions he has made and continues to make regarding LMM.

142.    As an expired, dissolved and inactive business, LMM has no ongoing business and no active participants.  Wardley and McLachlan alone have any remaining interest in LMM.

143.    In addition to being one of two equal directors of and shareholders in LMM, McLachlan has used and continues to use his position as "President" of LMM to control the management of LMM.

144.    Seeking approval from LMM, or its officers, directors or shareholders, to bring this lawsuit would be hopeless and fruitless because McLachlan would not elect for LMM to sue McLachlan or Kearl, and McLachlan has the ability alone to veto any such action by LMM.

145.    This lawsuit will not expose LMM or Defendants to a multiplicity of actions, but ensures that these disputes between these parties will be decided in a single action.

146.    Wardley is not aware of any third-party creditors of LMM and believes there are none.  Thus, no creditors of LMM will be prejudiced by this action.

147.    This action will not interfere with a fair distribution of the recovery among all interested persons because all interested persons are parties to this action and this action will decide the fair distribution of the recovery among all interested persons.

148.    Based on Wardley's position, as summarized herein, Wardley does not and will not have a conflict of interest in pursuing this action because Wardley and LMM's interests are aligned, neither Wardley nor LMM wishes to pay unnecessary taxes, and LMM never has claimed, and does not now claim, an interest in the recovery that Wardley seeks in this lawsuit.

### FIRST CAUSE OF ACTION
**(Breach of Fiduciary Duty –McLachlan)**

149.    Wardley incorporates and realleges the preceding paragraphs as if fully set forth herein.

150.    Wardley and McLachlan were business partners and they placed trust and confidence in each other.

151.    As Wardley's business partner, as the president and a director of LMM, and as an agent to Wardley as a principal under the Water Agreement, McLachlan owed and owes fiduciary duties to Wardley.

152.    As the president and a director of LMM, McLachlan owed and owes fiduciary duties to LMM.

153.    McLachlan's fiduciary duties to Wardley and LMM include the duties of loyalty, due care, not to engage in self-dealing, to act with the utmost good faith and in the best interests of LMM and Wardley, to be truthful with Wardley and LMM, and to fully disclose information to Wardley and LMM.

154.    McLachlan breached his fiduciary duties of loyalty and not to engage in self-dealing by recklessly and publicly advancing tax arguments against LMM's interest, risking harm to LMM, solely to benefit McLachlan and to hurt Wardley; by advancing a tax argument on behalf, but not for the benefit, of LMM solely to benefit himself in his disputes with Wardley, with no action or even intent consistent with the tax argument but simply to use it until he gets what he wants from Wardley; and by allowing Kearl (and McLachlan's personal counsel) to represent and advise LMM despite Wardley's objections and their known and identified conflicts of interests, solely because they served McLachlan's own self-interests.

155.    McLachlan breached his fiduciary duty of due care by recklessly and publicly advancing tax arguments without seeking the advice of a qualified tax accountant and/or tax attorney, despite Wardley's repeated requests for him to do so; by recklessly and publicly advancing tax arguments on behalf, but not for the benefit, of LMM based solely on the advice of non-tax professionals over Wardley's objection and over the advice of LMM's CPA who advised LMM differently; by allowing Kearl (and McLachlan's personal counsel) to represent and advise LMM despite their known and identified conflicts of interest, despite their lack of knowledge and expertise to offer such advice, and over Wardley's repeated objections; and by maintaining the significant Water Agreement funds in a low-interest savings account instead of investing such funds in any investment or, even more appropriately, permitting Wardley to have his own shares of the Water Agreement funds to use and invest as he pleased.

156.    McLachlan breached his fiduciary duty of acting in the utmost good faith and in the best interests of LMM and Wardley by withholding Wardley's and Staks' Water Agreement payments based on a pretextual tax argument that McLachlan had no intent or desire to follow through on, and designed solely to benefit McLachlan in the short term at the risk and expense of LMM and Wardley; and by allowing Kearl (and McLachlan's own counsel) to represent and advise LMM despite their known and identified conflicts of interest, despite their lack of knowledge and expertise to offer such advice, and over Wardley's repeated objections.

157.    McLachlan engaged in self-dealing in violation of his fiduciary duties by fabricating and publicly advancing a pretextual tax argument designed and implemented solely to gain leverage over Wardley and to force Wardley into an artificially lopsided and unfair settlement.

158.    McLachlan breached his fiduciary duty to be truthful with Wardley and LMM by recklessly and publicly advancing a tax argument on behalf, but not for the benefit, of LMM that McLachlan had no intent or desire to follow through on, and designed solely to benefit McLachlan in the short term at the risk and expense of LMM and Wardley; by actively concealing from LMM and Wardley McLachlan's true purpose and intent in advancing that tax argument; and by actively concealing from LMM and Wardley the advice and strategies conveyed to McLachlan by Kearl, legal counsel, and others regarding such tax advice.

159.    McLachlan breached his fiduciary duty to disclose information to Wardley and LMM by withholding distribution of Wardley's and Staks' Water Agreement payments based on a pretextual tax argument on behalf, but not for the benefit, of LMM that McLachlan had no intent or desire to follow through on, and designed solely to benefit McLachlan in the short term at the risk and expense of LMM and Wardley; by failing and refusing to disclose to LMM and Wardley McLachlan's true purpose and intent in advancing that tax argument; and by failing and

refusing to disclose to LMM and Wardley the advice and strategies conveyed to McLachlan by Kearl and legal counsel regarding such tax advice.

160.    McLachlan breached his fiduciary duties to Wardley by depriving Wardley of his 103.24 acre feet of the remaining Water Credits solely to try to benefit McLachlan by using the withheld Water Credits to obtain leverage over Wardley and to force Wardley into a global settlement more favorable to McLachlan.

161.    McLachlan breached these duties to Wardley and LMM and knowingly acted against Wardley and LMM's best interests, for McLachlan's own personal profit and benefit.

162.    As a direct and proximate result of McLachlan's breaches of fiduciary duty, Wardley has been damaged, including, for example, through the loss of the Water Agreement funds, the loss of the Water Credits and the cost to replace them, the lost profits that would have been derived from such assets, and the lost time value of having such money and assets. Wardley has been damaged in an amount to be determined at trial, but not less than $3,500,000, plus attorney fees, costs, and pre- and post-judgment interest.

163.    McLachlan's conduct was and is willful or malicious, or conduct that manifests a knowing and reckless/wanton indifference toward, and disregard of, Wardley's rights; thus Wardley is entitled to an award of punitive damages against McLachlan.

### SECOND CAUSE OF ACTION
### (Conversion – McLachlan)

164.    Wardley incorporates and realleges the preceding paragraphs as if fully set forth herein.

165.    Wardley was and is the rightful owner of certain assets, both tangible and intangible, including but not limited to his 48.5% of the Water Agreement funds and his remaining 103.24 acre feet of the Water Credits.

166.    McLachlan has wrongfully converted and misappropriated the Water Agreement funds owed to Wardley, as well as the portion of the Water Credits owed to Wardley, solely for McLachlan's own purposes and self-interests.

167.    McLachlan willfully interfered in Wardley's assets, for an illegal, improper, and self-dealing purpose, without lawful justification, thereby depriving Wardley of the use and possession of such assets.

168.    McLachlan's actions have damaged Wardley in an amount to be established at trail, but not less than $3,500,000, plus attorney fees, costs, and pre- and post-judgment interest.

169.    McLachlan's conduct was and is willful or malicious, or conduct that manifests a knowing and reckless/wanton indifference toward, and disregard of, Wardley's rights; thus Wardley is entitled to awards of punitive damages against McLachlan.

170.    Moreover, McLachlan should not be allowed to retain the benefit of his wrongful actions or continue to engage in wrongful actions.  Therefore, he should be required to disgorge the benefits wrongfully converted, and Wardley is entitled to an accounting and the imposition of a constructive trust created for his benefit to the exclusion of McLachlan holding his assets, and all monies that may properly belong to Wardley, the exact nature and value of which are to be determined.

### THIRD CAUSE OF ACTION
**(Aiding and Abetting Breach of Fiduciary Duty –Kearl)**

171.    Wardley incorporates and realleges the preceding paragraphs as if fully set forth herein.

172.    McLachlan owed fiduciary duties to LMM and Wardley, as detailed above.

173.    McLachlan breached his fiduciary duties to LMM and Wardley, as detailed above.

174.    Kearl knowingly participated in McLachlan's breaches of fiduciary duty.

175.    Kearl knew that McLachlan owed LMM and Wardley fiduciary duties.

176.    Kearl knowingly conspired with McLachlan to develop the above-detailed schemes for McLachlan to engage in self-dealing and other fiduciary breaches regarding the Water Agreement funds, the Water Credits, and withholding and concealing information from LMM and Wardley solely to benefit McLachlan at the risk and expense of LMM and Wardley.

177.    Kearl advised McLachlan to take these actions knowing that doing so would constitute self-dealing and other breaches of McLachlan's fiduciary duties to LMM and Wardley.

178.    Kearl actively participated in carrying out and promoting those self-dealing actions by developing and advancing the arguments, by carrying out business and litigation tasks to advance those arguments, and by pushing McLachlan to continue to engage in those fiduciary breaches to advance McLachlan's own self-interests to the detriment of LMM and Wardley.

179.    The above-described scheme that Kearl helped McLachlan develop and advance was beyond the scope of Kearl's expertise, beyond the scope of Kearl's representation of McLachlan and LMM, and was knowingly designed not for its veracity or legality but solely to allow McLachlan to advance the argument and try to harm Wardley in the short-term in order to gain and exercise leverage over Wardley and to force Wardley into an artificially lopsided and unfair settlement.

180.    Kearl knowingly participated and assisted McLachlan in acts of self-dealing and breaching McLachlan's fiduciary duties to LMM and Wardley, and thus aided and abetted McLachlan's breaches of McLachlan's fiduciary duties.

181.    As a direct and proximate result of Kearl's aiding and abetting McLachlan's breaches of fiduciary duty, Wardley and LMM have been damaged in an amount to be

determined at trial, but not less than $3,500,000, plus attorney fees, costs, and pre- and post-judgment interest.

182.    Kearl's conduct was and is willful or malicious, or conduct that manifests a knowing and reckless/wanton indifference toward, and disregard of, Wardley's rights; thus Wardley is entitled to awards of punitive damages against Kearl.

**FOURTH CAUSE OF ACTION**
**(Intentional Interference with Economic Relations –McLachlan and Kearl)**

183.    Wardley incorporates and realleges the preceding paragraphs as if fully set forth herein.

184.    Defendants intentionally interfered with Wardley's existing economic relations by knowingly and intentionally advancing tax arguments, and knowingly and intentionally depriving Wardley of his Water Agreement funds and his Water Credits, solely to undermine Wardley's financial standing and to interfere in Wardley's ability to foster and continue his existing economic relations and his existing real estate developments.  Defendants' conspiracy with each other and actions were designed and intended for that very purpose—to harm Wardley's existing economic relations so that Wardley would be unduly pressured, give up in the Wells Case, succumb to the fabricated leverage McLachlan and Kearl tried to create based solely on pretext, and be forced to enter into an artificially lopsided and unfair settlement.

185.    Defendants knew of Wardley's existing economic relationships, and Wardley's existing and ongoing developments, and intentionally took actions to interfere in Wardley's relationships and developments, solely to benefit McLachlan over Wardley.

186.    McLachlan intentionally interfered in Wardley's existing economic relations by improper means in violation of the law and McLachlan's fiduciary duties to Wardley, including by fabricating and recklessly advancing pretextual tax arguments, and withholding Wardley's money and assets, solely to allow McLachlan to gain leverage over Wardley and force Wardley

into an artificially lopsided and unfair settlement.  McLachlan's breaches of fiduciary duty and other violations of the law alleged herein constitute the improper means by which McLachlan intentionally interfered in Wardley's existing economic relations.

187.    Kearl intentionally interfered in Wardley's existing economic relations by improper means in violation of the law, including by aiding and abetting McLachlan in his breaches of fiduciary duty.  Kearl's aiding and abetting McLachlan's breaches of fiduciary duty and other violations of the law alleged herein, including through Kearl's misrepresentations of his status as a CPA, constitute the improper means by which Kearl intentionally interfered in Wardley's existing economic relations.

188.    As a direct and proximate result of Defendants' intentional interference in Wardley's economic relations, Wardley has been damaged, including, for example, through the loss of his share of the Water Agreement funds, the loss of his share of the Water Credits and the cost to replace them, the lost profits that would have been derived from such assets, the loss of business and economic opportunities resulting from Defendants depriving Wardley of his money and assets, and the lost time value of having such money and assets.  Wardley has been damaged in an amount to be determined at trial, but not less than $3,500,000, plus attorney fees, costs, and pre- and post-judgment interest.

189.    Defendants' conduct was and is willful or malicious, or conduct that manifests a knowing and reckless/wanton indifference toward, and disregard of, Wardley's rights; thus Wardley is entitled to an award of punitive damages against Defendants.

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment, 28 U.S.C. § 2201 – McLachlan and Kearl)

190.    Wardley incorporates and realleges the preceding paragraphs as if fully set forth herein.

191.    This action is brought pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act, which allows this Court to adjudicate parties' respective rights and other legal relations in an actual controversy.  This court has power to issue declaratory judgments determining rights, status and other legal relations within its jurisdiction.

192.    Wardley's rights to obtain his share of the withheld and anticipated Water Agreement funds and to access and use his share of the Water Credits are at issue by virtue of Defendants creating those disputes to gain leverage over Wardley and to force Wardley into an artificially lopsided and unfair settlement.

193.    Declaratory relief is sought because a judgment will terminate the controversy and remove uncertainty.

194.    Wardley is entitled to 48.5% of the withheld Water Agreement funds, as well as 48.5% of the anticipated Water Agreement funds.

195.    McLachlan is withholding Wardley's share of the Water Agreement funds based on a pretextual tax argument designed solely to give McLachlan leverage over Wardley and to force Wardley into an artificially lopsided and unfair settlement.

196.    Wardley is entitled to 103.24 acre feet of the Water Credits.

197.    McLachlan is withholding Wardley's share of the Water Credits, and threatening the City to force the City continue to withhold such Water Credits, solely to give McLachlan leverage over Wardley and to force Wadley into an artificially lopsided and unfair settlement.

198.    Wardley is entitled to, and hereby request, declaratory judgment as follows:

        a.    Wardley is entitled to 48.5% of the withheld Water Agreement funds, and McLachlan must act in good faith to release those funds to Wardley immediately;

    b.   Wardley is entitled to 48.5% of the anticipated Water Agreement Funds still to be paid by the City, and McLachlan must act in good faith to release those funds to Wardley immediately upon direct or indirect receipt of such funds from the City;

    c.   Defendants shall take no further action, and Defendants shall advance no additional argument, to delay payment of the Water Agreement funds to, or to withhold payment of the Water Agreement funds from, Wardley until such funds are paid in full;

    d.   Wardley is entitled to request and receive 103.24 acre feet of Water Credits from the City;

    e.   Defendants shall take no further action, and Defendants shall advance no additional argument, to delay or hinder Wardley's receipt of his 103.24 acre feet of Water Credits from the City, until all 103.24 acre feet of Water Credits are distributed to and received by Wardley; and

    f.   Such other legal and equitable relief as the Court deems just.

## SIXTH CAUSE OF ACTION
### (Injunctive Relief – McLachlan and Kearl)

199.    Wardley incorporates and realleges the preceding paragraphs as if fully set forth herein.

200.    Wardley is entitled to 48.5% of the withheld Water Agreement funds, as well as 48.5% of the anticipated Water Agreement funds.

201.    McLachlan is withholding Wardley's share of the Water Agreement funds based on a pretextual tax argument designed solely to give McLachlan leverage over Wardley and to force Wardley into an artificially lopsided and unfair settlement.

202.    Wardley is entitled to 103.24 acre feet of the Water Credits.

203.    McLachlan is withholding Wardley's share of the Water Credits, and threatening the City to force the City to continue to withhold such Water Credits, solely to give McLachlan leverage over Wardley and to force Wadley into an artificially lopsided and unfair settlement.

204.    As a result of Defendants' misconduct, Wardley is entitled to an order of this Court effective for the pendency of this lawsuit and permanently restraining Defendants from continuing or taking any action to deprive Wardley of his Water Agreement funds, or to deprive Wardley of his share of the Water Credits.  McLachlan should be compelled to release Wardley's share of the withheld Water Agreement funds, and enjoined from taking any action to deprive Wardley from immediately receiving his share of the anticipated Water Agreement funds. McLachlan also should be compelled to release—and enjoined from withholding consent for the release of—Wardley's share of the Water Credits.

205.    Because Defendants' tax argument basis for withholding Wardley's and Staks' Water Agreement funds is and always has been entirely pretextual and self-serving, with no intention, desire or action to date by Defendants to have LMM file a tax return or pay any taxes, and because any action by Defendants to do so now would be in bad faith and solely to shield Defendants from their own wrongdoing and the legal consequences of their own scheme as alleged herein, Wardley is entitled to an order of this Court effective for the pendency of this lawsuit and permanently restraining Defendants from taking any action regarding taxation on the Water Agreement funds that is inconsistent with LMM, Wardley, and McLachlan's practices regarding taxation on the Water Agreement funds for the first decade after the Water Agreement was executed *unless* LMM hires an independent accounting firm, mutually selected by Wardley and McLachlan, and such independent accounting firm advises LMM to take a new or different tax position.

206. Wardley and LMM will suffer irreparable harm unless the Court issues a temporary restraining order, preliminary injunction, and permanent injunction as requested by Wardley.

207. Unless a temporary restraining order, preliminary injunction, and an injunction are issued, the threatened injury to Wardley and LMM outweighs whatever damage the proposed order and injunction may cause Defendants. Indeed, such order will benefit McLachlan in that he too will obtain his share of the Water Agreement funds and of the Water Credits. The only possible loss to McLachlan is the loss of a pretextual argument to obtain leverage, which is no loss at all.

208. The issuance of a temporary restraining order, preliminary injunction, and injunction will not be adverse to the public interest. Indeed, the public interest will be served in the City because the City's obligations, risks and costs regarding the Water Credits will be eliminated.

209. There is a substantial likelihood that Wardley will prevail on the merits of his underlying claims in this case, and there remain important issues to be litigated in this case.

**PRAYER FOR RELIEF**

WHEREFORE, Wardley respectfully pray for the following relief:

A.    For judgment on each cause of action as requested;

B.    For damages and punitive damages, as set forth above;

C.    For equitable and declaratory relief as set forth above;

D.    For a restraining order, preliminary injunction, and injunctive relief, as requested in the Sixth Cause of Action, above;

E.    For an award of costs, attorney fees, and contractual, pre-judgment and post-judgment interest as allowed by law; and

F.      For such additional relief as this Court deems appropriate.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Wardley hereby demands a trial by jury on all issues so triable.

DATED this 3rd day of March, 2021.

SNELL & WILMER, LLP


*/s/  Jeremy J. Stewart*
Matthew L. Lalli
Jeremy J. Stewart
*Attorneys for Lynn Wardley*